RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0084P (6th Cir.)
File Name: 02a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

PAUL GREGORY HOUSE,
      *Petitioner-Appellant,*

     *v.*

RICKY BELL, Warden,
      *Respondent-Appellee.*

No. 00-6136

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 96-00883—James H. Jarvis, District Judge.

Argued: October 31, 2001

Decided and Filed: March 11, 2002

Before: MERRITT, NORRIS, and SILER, Circuit Judges.

———————

**COUNSEL**

**ARGUED:** Stephen M. Kissinger, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Glenn R. Pruden, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE DIVISION, Nashville, Tennessee, for Appellee. **ON BRIEF:** Stephen M. Kissinger, FEDERAL DEFENDER SERVICES, Knoxville, Tennessee, for Appellant. Glenn R. Pruden, Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE

DIVISION, Nashville, Tennessee, Michael E. Moore, Paul G. Summers, TENNESSEE ATTORNEY GENERAL'S OFFICE, CIVIL LITIGATION & STATE SERVICES DIVISION, Nashville, Tennessee, for Appellee.

NORRIS, J., delivered the opinion of the court, in which SILER, J., joined. MERRITT, J. (pp. 28-33), delivered a separate dissenting opinion.

_____

**OPINION**

_____

ALAN E. NORRIS, Circuit Judge. Petitioner Paul House appeals from the district court's denial of a writ of habeas corpus, 28 U.S.C. § 2254. A Tennessee jury found petitioner guilty of the murder of a neighbor, Carolyn Muncey, and sentenced him to death.

This court granted a certificate of appealability as to all issues. However, petitioner has limited his brief to a discussion of the following: 1) Whether the manner in which the Tennessee courts applied the doctrine of waiver during petitioner's post-conviction proceedings constitutes an adequate and independent state procedural bar to his ineffective assistance of counsel claim; 2) Whether petitioner established his actual innocence.

For the reasons that follow, we affirm the denial of the writ.

**I.**

This court reviews a district court's legal conclusions in a habeas proceeding de novo and its factual findings for clear error. *See Lucas v. O'Dea,* 179 F.3d 412, 416 (6th Cir. 1999). Petitioner initiated this habeas action on September 30, 1996; the petition was amended on September 16, 1997. Consequently, this court's review of the state court's decision is governed by the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132,

110 Stat. 1214 (1996) ("AEDPA"). *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997).

Because factual determinations by state courts are entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), we will begin by quoting from the Tennessee Supreme Court's opinion denying petitioner relief in his direct appeal:

   The victim of the homicide was Mrs. Carolyn Muncey, who lived with her husband and two young children on Ridgecrest Road in rural Union County, Tennessee. Mrs. Muncey was in her late twenties, and her children were about eight and ten years old at the time of her death on July 13, 1985.

   In March 1985 appellant Paul Gregory House was released from prison in Utah and moved to the rural community in which the Muncey family lived. There he resided with his mother and step-father for several weeks, but in June he moved into a trailer occupied by his girl friend, Donna Turner, which was located about two miles from the Muncey home. Appellant did not own an automobile; but he was permitted to drive his mother's car from time to time, and he also drove Ms. Turner's car on some occasions.

   Other than doing occasional farm work for his stepfather, appellant does not appear to have been regularly employed. He did not testify at trial at either the guilt phase or the sentencing hearing. He was shown to have had one prior conviction for aggravated sexual assault, a charge to which he pled guilty on March 16, 1981 in Salt Lake County, Utah. Apparently he was placed on parole in that state, and supervision of his parole was transferred to Tennessee when he returned to this state. He was approximately twenty-three years old at the time of the homicide in this case.

   Mrs. Muncey disappeared from her home in the late evening of Saturday, July 13, 1985. Her badly beaten

body was found on the following afternoon at about 3 p.m., lying partially concealed in a brush pile about 100 yards from her home.

Apparently the husband of the victim was not at home during the early part of the evening of July 13. Mrs. Muncey and her children visited a neighbor and left at about 9:30 p.m. to return to their home. Later the older child, Laura, awoke. She testified that she heard a voice which sounded like her grandfather making inquiry about her father. She also heard someone tell her mother that her father had been in a wreck near the creek. She heard her mother sobbing or crying as she left the house. When her mother did not return, the two children went to look for her at neighboring homes. Not finding her, they returned home and waited until their father arrived. Discovering that his wife was missing, he took the children back to the home of the neighbor where they had visited earlier in the evening and then called for members of his family to look for his wife.

When the body of Mrs. Muncey was discovered the next afternoon, she was dressed in her nightgown, housecoat and underclothing. Her body was badly bruised, and there were abrasions and blood giving every evidence that she had been in a fierce struggle. Apparently a severe blow to her left forehead had caused her death. It appeared, however, that she had also been partially strangled. A pathologist testified that the blow to her left forehead caused a concussion and hemorrhage to the right side of the brain from which she died, probably one to two hours after being struck. He testified that she probably would have been unconscious after having been struck. He estimated the time of her death at between 9 p.m. to 11 p.m. on Saturday, July 13, but emphasized that this was at best a rough estimate.

Appellant never confessed to any part in the homicide, and the testimony linking him to it was circumstantial. There was evidence showing that he knew Mr. and Mrs.

performing his tests. The photograph of the styrofoam container clearly shows that blood spilled in the container. The tape on the container was mysteriously cut and retaped contrary to standard procedure. The label on the container said it contained the semen and the blood evidence, but the semen evidence was shipped separately. Also, the location of the blood on the jeans is odd. The five spots were found on the outside left leg, on the inside left thigh, on the *inside* right pocket, outside the right pocket, and on the right cuff, respectively.

The testimony of Pauline Sutton also raises questions as to whether the jeans were tampered with. She noted that some of the blood stains were mixed with mud. The National Weather Service records show that it had not rained for three days prior to the murder, and photographs of the crime scene showed no mud present. Lastly, there was no mud on the victim's nightgown. All of this evidence raises serious questions as to how the mud got on the jeans. The district court relies on TBI Agent Charles Scott's testimony that the jeans had "reddish brown" stains when he took them from the clothes hamper. Mr. Scott, however, admittedly did not thoroughly examine the jeans. Because he could have tampered with the jeans, and because the forensic evidence does not support his testimony, a new trial is warranted in light of all the problems in this death case.

In sum, I believe the new evidence of the semen, the confessions, and the enzymatic degradation make it more likely than not that a reasonable doubt would be raised in the mind of any reasonable juror. Accordingly, I would grant the writ of habeas corpus.

enzymes came from the same sample, that is, the blood on the defendant's jeans came from the sample taken from the victim, not the victim herself.

In his report, Dr. Cleland Blake, Assistant Chief Medical Examiner for the State, reached the conclusion that the blood on House's jeans came from the samples taken from the victim's body, presumably based on theory of enzmatic degradation explained above. He did not, however, explain how he reached his conclusions in his report. Recognizing the significance of Blake's conclusion to the question of House's innocence, the district court inquired about the enzymatic degradation of the blood stains, but did not receive a satisfactory explanation from Dr. Blake. Because Dr. Blake neglected to explain in layman's terms the method by which he reached his conclusion, the district court relied on the testimony of Agent Bigbee who opined that Blake's theory was incorrect. I believe that on the surface, Blake's findings are compelling and require further exploration. Because of the paramount significance of these findings to the question of House's innocence, an independent analysis by a blood expert of Blake's theory of enzymatic degradation is needed to determine whether the blood on House's jeans came from the victim herself or from a forensic blood sample. In addition, I would, to the extent possible, have the untested fingernail scrapings of the victim examined to determine whether there is any DNA evidence.

Standing alone, one might argue that the similarity in enzymatic activity was merely coincidental. However, there is additional evidence suggesting that the sample in the vials of blood may have been tampered with. As Dr. Blake noted, there was no unbroken chain of custody. Larry Johnson, an expert in crime scene investigation, similarly stated that "the packaging of the materials in the case did not meet professional standards."

Furthermore, there is blood missing from the sample taken – one of the four vials is empty and another is only half-full – but Agent Bigbee used only one-fourth of a vial in

Muncey and had been with them socially on a few occasions. Through defense proof there was testimony that Mrs. Muncey and her husband had been having marital difficulties and that she had been contemplating leaving him. There was no evidence to indicate that the appellant was aware of that situation, however, or that there had been any previous romantic or sexual relationship between him and the victim.

On the afternoon of Sunday, July 14, 1985, two witnesses saw the appellant emerge from a creek bank at the side of Ridgecrest Road at the site where Mrs. Muncey's body was later found concealed in the underbrush. He was wiping his hands with a dark cloth and was walking toward a white Plymouth automobile, parked on the opposite side of the road, belonging to his girl friend Donna Turner. The two witnesses spoke briefly to appellant, all of them discussing the fact that Mrs. Muncey had disappeared. Later the two witnesses became suspicious of what they had observed and returned to the point where they had seen appellant emerge from the embankment. Looking down the bank, they found the partially concealed body of Mrs. Muncey. They promptly notified the sheriff.

Appellant later admitted that he had been in the area but denied that he had seen the body of Mrs. Muncey or had any knowledge of its presence. The dark rag which he had been using when first seen was never produced. It was the theory of the State, however, that this was a dark "tank top" or jersey which appellant was shown to have been wearing on the previous evening, July 13.

Appellant gave two statements to investigating officers in which he denied being involved in the homicide. In both of these statements he stated that he had been at Ms. Turner's trailer the entire evening of July 13 and that he had not left until the next afternoon when he went to look for Hubert Muncey after learning of the disappearance of the latter's wife.

On Sunday afternoon various witnesses observed that appellant had numerous scratches and bruises on his arms, hands and body, there being an especially significant bruise on the knuckle of his right ring finger. Appellant explained that these injuries had been sustained innocently earlier during the week, but when Ms. Turner was called as a witness, she said that she had not observed them prior to the evening of July 13. Appellant also told investigators that he was wearing the same clothes on Sunday, July 14 as he had been wearing the previous evening. It was later discovered, however, that a pair of blue jeans which he had been wearing on the night of the murder was concealed in the bottom of the clothes hamper at Ms. Turner's trailer. These trousers were bloodstained, and scientific evidence revealed that the stains were human blood having characteristics consistent with the blood of Mrs. Muncey and inconsistent with appellant's own blood. Scientific tests also showed that fibers from these trousers were consistent with fibers found on the clothing of the victim. There were also found on her nightgown and underclothing some spots of semen stain from a male secretor of the same general type as appellant.

Some of the most damaging evidence against appellant was given by his girl friend, Ms. Turner. She at first told investigators that he had not left the trailer during the course of the evening of July 13. Later, however, she modified this testimony to state that he had been in the trailer until about 10:45 p.m. at which time he left to take a walk. She stated that he did not take her automobile. When he returned an hour or so later, he was panting, hot and exhausted. He was no longer wearing either his blue jersey or his tennis shoes. The shoes were later found in an area different from the place where appellant told her he had lost them.

Appellant told Ms. Turner that he had thrown away the navy blue tank top because it had been torn when he was assaulted by some persons who tried to kill him. It was

decide this question or indulge in a presumption that she has an infallible memory of events that happened in the middle of the night when she was ten years old. As a result of the underlying facts, I find that the district court committed clear error by discounting the credibility of *two* independent, unbiased individuals without any rationale other than the time between the confession and the testimony before the district court. The state trial court should weigh this evidence at a new time.

### 3.    *The Blood Evidence Creates a Serious Doubt.*

Third, analysis of the blood on House's jeans raises serious doubts as to whether the blood came directly from the victim or spilled on the jeans from vials of blood of the victim sent with the jeans to the lab. Agent Bigbee tested the blood from Ms. Muncey's body and the blood found on Paul House's jeans. There was a clear match, revealing that the blood on his jeans belonged to the victim. A closer examination of the forensic evidence, however, suggests that the blood on the jeans may have come from the forensic sample taken from Ms. Muncey's body, not from her body as she was murdered.

The most significant piece of forensic evidence suggesting this conclusion is the consistency in enzyme degradation between the sample from Ms. Muncey's body and the five samples from the jeans. Enzymes are proteins which have a complex molecular structure. Their fragile structure is only maintained by the proper environment provided in the human body. Over time, enzymes degrade; that is, they lose their structure and shape and become inactive. The blood tests performed by Agent Bigbee on the victim's blood and the five samples from the defendant's jeans looked for the presence of various enzymes (to see whether they had denatured or not) in the blood. Of the ten enzymes tested, six had conclusive results. All six enzymes matched. Thus, it is reasonable to infer that the enzymes in the blood on the jeans degraded at the same rate as the blood in the sample taken from the victim's body. Because they degraded at the same rate despite being in two different media, it appears that the

that he -- the husband -- committed the crime. Both Kathy Parker and Penny Letner provided consistent accounts of Muncey's admission of guilt. There was no evidence in the record that challenged the reliability of these statements or suggested any bias or motive for either to be untruthful. Also, the confessions are supported by the well documented domestic abuse of the victim by Muncey and his actions the following morning when he asked a neighbor, Artie Lawson, to lie for him and provide an alibi by testifying that he was at the dance for the entire evening.

The district court, however, discounted the confessions because both witnesses had waited over ten years to come forward. In addition, the district court found that the testimony of Lara Muncey Tharp contradicted the testimony of Letner and Parker because Tharp did not hear any struggle and none of the furniture was out of place in the house. This interpretation is erroneous because neither Letner or Parker asserted that Muncey's purported fight with his wife occurred *inside the house*. They both testified that he went home from the dance and got into the fight with his wife, but did not describe *where* the fight occurred. Muncey could have asked his wife to come outside of the house in order to not disturb their children. Tharp's testimony that her father was not abusive toward her mother, despite the common knowledge in the community that he physically abused her, further supports the idea that Muncey might ask his wife to leave the house in order to express his displeasure with her.

In addition, while Tharp may appear as a credible witness now that she is in her twenties, Tharp was only ten years old at the time of the incident, raising a question as to how accurate or specific her memory may be. For instance, at the initial trial, Tharp described a car arriving at the house prior to her hearing the low voice that told her mother that her father had been in a wreck. At the district court hearing, however, Tharp denied hearing a car that night. It should be for a state trial jury to weigh the credibility of a daughter of a potential suspect with both emotional and personal incentive to protect her father. It is not for us or the District Court to

---

after the appellant's return to the trailer that Ms. Turner first noticed the bruises and abrasions on his hands referred to previously.

Appellant's mother testified that he had not used her automobile on Saturday evening. She testified that during Saturday and Sunday she had been planning to separate from appellant's stepfather and that appellant had been assisting her in her preparations for moving.

At the sentencing hearing the State proved appellant's prior conviction for aggravated sexual assault. Appellant's parents testified that he came from a broken home and had been subjected to stress as a result of that experience. Appellant's mother also testified that in the interval between the guilt trial and the sentencing hearing appellant had attempted suicide. She read into evidence a letter which he had written to her denying his involvement in the homicide. Apparently he had cut his wrists while in the jail awaiting the sentencing hearing, but the degree and extent of the injuries were not detailed in evidence. They do not appear to have been serious and did not prevent his attending the sentencing hearing.

Although the evidence against appellant was circumstantial, it was quite strong. Particularly incriminating was the testimony that he had emerged from an embankment where the body was found, wiping his hands on a dark cloth, without disclosing to anyone the presence of the body. Damaging also were the discovery of his bloodstained trousers and the testimony of Ms. Turner, which a trier of fact could have found sufficient to demolish his alibi and to demonstrate that he had been in a heavy struggle near the time when the homicide must have occurred.[1]  A classic case for

---

[1] After returning from his "walk," appellant suggested marriage to Ms. Turner for the first time in their relationship. It was at least arguable that he thought by this means her testimony could be rendered inadmissible by the husband-wife privilege.

determination by a jury was presented, and the evidence clearly is sufficient to support the conviction.

Following the sentencing hearing, the jury imposed the death penalty. In their verdict they found that the State had established three aggravating circumstances, these being: (1) appellant had previously been convicted of a felony involving the use or threat of violence to the person; (2) the homicide was especially heinous, atrocious, or cruel; and (3) it was committed while appellant was committing or attempting to commit or fleeing from the commission of rape or kidnapping. T.C.A. §§ 39-2-203(i)(2), (5), and (7).

There was ample evidence to support all of these findings and to support the conclusion of the jury that no mitigating circumstances had been established which would outweigh the aggravating circumstances. Certainly the sentence of death was not disproportionate to that imposed in other cases in view of the violent and brutal nature of the homicide shown in this record.

*State v. House*, 743 S.W.2d 141, 142-43 (Tenn. 1987) (footnote original).

After petitioner's conviction and sentence was handed down in February 1986, he took a direct appeal to the Tennessee Supreme Court. The Tennessee Supreme Court affirmed in the opinion just cited. Petitioner failed to seek a writ of certiorari in a timely manner.

Post-conviction proceedings began in February 1988 with the filing of a *pro se* petition for post-conviction relief in the trial court. This petition, amended after appointment of counsel, was denied by the trial court on November 29, 1988. Although claims of ineffective assistance of trial counsel were submitted to the court, they were not argued, nor was trial counsel called as a witness at the hearing. Only a single issue was taken to the Tennessee Court of Criminal Appeals: whether a jury instruction improperly misled jurors into believing that they must unanimously find mitigating

subjecting the lady to some kind of indignity, why would you get a lady out of her house, late at night, in her night clothes, under the trick that her husband has had a wreck down by the creek? Why is it that you want to get her down by the creek? . . . . [I]t is either to keep her from telling what you have done to her, or it is that you are trying to get her to do something that she nor any mother on that road would want to do with Mr. House. . . . and you kill her because of her resistance.

Tr. Trans. Vol. IX, p. 1302-03. Because the only motive presented by the State at trial was based on evidence now completely discredited, I would issue the writ requiring a new trial. This new evidence obviously also mandates a new sentencing hearing because rape was the underlying basis for one of the three aggravating factors presented at trial. Coupled with the prior conviction for sexual assault, the State's assertion that the jury infer rape added a level of egregiousness to the crime that would not otherwise have been present and as a result was particularly prejudicial to the jury's determination of aggravating and mitigating circumstances at the sentencing phase.

Both the majority here and the lower court assert that because the aggravating circumstance at issue is rape and/or kidnapping, disproving the rape is not enough to create reversible error. It is clear, however, based on the information before the jury, that rape, not kidnapping, was the action resulting in the finding of an aggravating circumstance. Because the new evidence contradicts the jury's inference that House raped the victim, I find that this error is one that might reasonably be thought to have had "substantial and injurious effect or influence" on both the jury verdict and death sentence. *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

2.   *The Husband's Confession Tends to Disprove the Crime.*

Second, I am troubled by the cursory treatment of two independent accounts of the confession of Hubert Muncey

———————

**DISSENT**

———————

MERRITT, Circuit Judge, dissenting. I dissent from the majority opinion affirming the denial of Petitioner Paul House's petition for habeas corpus under 28 U.S.C. § 2254. As with many other Tennessee death penalty cases, this case had several errors in the trial phase which necessitate a new trial. I have a serious question about whether House is guilty of the crime for which he was convicted.

1.   *The New Semen Evidence Disproves Rape as the Motive.*

First, the new evidence pertaining to the semen found on the victim's underwear and nightgown undermines the State's proffered motive of rape at trial and thus raises a serious question as to whether a jury would have found Mr. House guilty, and would have used the inference of rape as an aggravating factor in sentencing him to death. At the district court habeas hearing, House offered undisputed testimony from DNA expert Lisa Calandro that eliminated House as a potential donor of the semen. Ms. Calandro concluded that the victim's husband was the donor of the semen. In addition, there is no other physical evidence supporting rape or attempted rape of the victim. There was no evidence of penetration, the victim's clothing was not ripped or removed, and there were no bruises on the victim indicating an attempted rape. The State seems now to concede these facts.

Yet, at trial, the State argued in its closing rebuttal that the Petitioner's motive in his purported killing of the victim was rape, based on the inference that the semen on the victim's clothing was his. The State presented the following argument:

Now you may have an idea why he did it. The evidence at the scene which seemed to suggest that he was

circumstances. The Court of Criminal Appeals affirmed the conviction on December 15, 1989. The Tennessee Supreme Court denied leave to appeal and the United States Supreme Court denied certiorari.

A second petition for post-conviction relief was filed on December 14, 1990. After conducting hearings, the trial court denied relief on the ground urged by the State: that all the issues presented had either been previously determined in the first petition or, if not, had been waived.

The Court of Criminal Appeals affirmed the trial court on September 2, 1992. However, the Tennessee Supreme Court remanded for reconsideration in light of a recent opinion that the Court later withdrew. The Court of Criminal Appeals remanded the matter to the trial court for further consideration of the waiver issue. This remand was averted, however, when the Tennessee Supreme Court re-instated the trial court's initial dismissal of the second petition for post-conviction relief. *House v. State*, 911 S.W.2d 705, 722 (Tenn. 1995). Critical for this habeas action is the Court's holding concerning waiver:

We conclude that a "full and fair hearing" sufficient to support a finding of previous determination occurs if a petitioner is given the opportunity to present proof and argument on the petition for post-conviction relief. We further conclude that the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally and therefore, "knowingly and understandingly," waive a ground for relief. Instead, waiver is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney. Finally, we conclude that there is no right to effective assistance of counsel in post-conviction proceedings, and therefore, an allegation of ineffective assistance of prior post-conviction counsel does not preclude application of the defenses of waiver and previous determination.

*Id.* at 714. Because of its holding, the Court re-instated the trial court's original denial of relief.

Petitioner filed a *pro se* habeas petition on September 30, 1996, which was eventually amended after the district court granted *in forma pauperis* status and appointed counsel. The district court granted the State's motion for summary judgment on the majority of claims in an order entered June 25, 1998. It conducted an evidentiary hearing on petitioner's actual innocence claim in February 1999. After considering post-hearing briefs of counsel, the district court denied habeas relief. It also denied a certificate of appealability, which was later superseded by this court's grant of a certificate as to all issues.

## II.

The first issue raised by petitioner on appeal involves his contention that both the Tennessee courts and the district court erred when they concluded that his ineffective assistance of counsel claims were procedurally barred.

Initially, the district court deferred granting summary judgment to the State on the claims of ineffective assistance of counsel because "these claims are intertwined with petitioner's claim of actual innocence." Memorandum Opinion, June 25, 1998 at 41. It went on to provide the following rationale:

> [T]he court will be unable to determine whether the claims should be barred on the ground of procedural default until the conclusion of the evidentiary hearing. *Bousley v. United States*, 118 S. Ct. 1604, 1611 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'") Accordingly, in addition to petitioner's claim of actual innocence, the court will consider [the ineffective assistance of counsel claims].

With respect to petitioner's theory that Mr. Muncey committed the murder, we defer to the finding of the district court that Ms. Letner and Ms. Parker, who allegedly heard Mr. Muncey's confession, were not credible. Furthermore, the content of Ms. Letner's testimony – that Mr. Muncey killed his wife during an argument in their trailer – is belied by the presence of the children in the trailer, who heard no such confrontation, and the lack of any signs of a struggle.

Petitioner has succeeded in showing that the semen attributed to him during the trial was that of Mr. Muncey and that, at some point, the blood evidence appears to have been mishandled. However, the district court concluded that "the spillage occurred after the FBI crime laboratory received and tested the evidence," a factual conclusion that is not clearly erroneous.

Despite his best efforts, the case against petitioner remains overwhelming. We therefore conclude that he has fallen short of showing, as he must, that it is more likely than not that no reasonable juror would have convicted him in light of new evidence.

## IV.

The judgment of the district court is **affirmed**.

According to Ms. Tharp, her parents got along fine. They argued, but she did not recall any physical pushing or hitting. If they argued, she could hear them if she was in her bedroom. The family did not have air conditioning in the home. She did not hear any arguments that night.

The court found Ms. Tharp a very credible witness. She had no reason to lie. Her testimony during the evidentiary hearing was consistent with her trial testimony.

Memorandum Opinion, February 16, 2000 at 12-13.

As the preceding recitation makes clear, petitioner has mounted a concerted attack on his conviction. To prevail, however, he must do more than raise questions about the reliability of portions of trial testimony or the manner in which physical evidence was handled or analyzed; he must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327. Moreover, in weighing the new evidence, we review the factual findings of the district court for clear error. *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001).

The following facts that implicate petitioner are undisputed: he lied to investigators about his whereabouts on the night of the murder; he gave inconsistent versions of the origins of the scratches and bruises on his hands and arms; he was seen near where the body was discovered on the day after the murder; he lied about what he was wearing on the night of the murder; blood and mud splattered blue jeans belonging to petitioner were found at the bottom of Ms. Turner's laundry hamper; petitioner has a deep voice and Lara Muncey testified that the man who came to the trailer on the night of the murder had a deep voice; and, according to Dr. Sutton, the blood and mud found on petitioner's blue jeans had been mixed together, which "certainly eliminates the possibility of any stains being created by contamination in an evidence container."

*Id.* at 41-42. However, after conducting an evidentiary hearing and determining that petitioner had failed to establish actual innocence, the district court held that petitioner's ineffective assistance of counsel claims were "barred on the ground of procedural default." Memorandum Opinion, February 16, 2000 at 46-47.

Petitioner concedes that an adequate and independent state-law ground can procedurally bar subsequent habeas claims. This circuit has developed a four-part analysis to determine whether a claim is barred:

Under *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), this circuit utilizes the following four-part analysis when the state argues that a federal habeas claim has been procedurally defaulted in state court: (1) whether there is a procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to follow this rule; (2) whether the state courts actually enforced the state procedural rule; (3) whether the state procedural rule is an adequate and independent state ground to foreclose federal relief; and if so (4) whether the petitioner has established cause for his failure to follow the rule and prejudice by the alleged constitutional error.

*White v. Schotten*, 201 F.3d 743, 749 (6th Cir. 2001).

Petitioner points to the tortured path that his case took in the courts of Tennessee and argues that no hard and fast rule existed to procedurally bar his *pro se* ineffective assistance of counsel claims. Specifically, he points to the following paragraph of the opinion of the Tennessee Supreme Court:

*Our research has revealed no reported Tennessee case dealing directly with the issue of the appropriate standard to apply when determining whether an issue has been waived.* Courts in other states have split on whether to apply a subjective or objective standard and provide us little assistance because their decisions were based largely on the particular state statutory procedure.

However, Tennessee cases dealing generally with the concept of waiver in the post-conviction context apply an objective standard and impute the conduct of counsel to their clients. *See e.g., Caruthers v. State,* 814 S.W.2d 64, 70 (Tenn. Crim. App. 1991); *State v. Bishop,* 731 S.W.2d 552 (Tenn. Crim. App. 1986).

*House*, 911 S.W.2d at 713 (emphasis added) (footnotes omitted). In petitioner's view, this opinion illustrates that no rule had been clearly established.

We do not write on a clean slate with respect to this issue. *See Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001); *see also Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998). In *Cone*, this court made clear that the *House* opinion relied upon by petitioner merely explained existing state law. Petitioner in that case contended that he had not personally waived a challenge to a jury instruction. In rejecting his claim, we explained:

First, we are aware of two cases in which courts have considered whether a petitioner is bound by his attorney's waiver of a constitutional claim, *Coe,* 161 F.3d 320, and *House v. State,* 911 S.W.2d 705 (Tenn.1995). The *House* court stated that "[w]aiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." *House,* 911 S.W.2d at 714. *House* does not appear to announce a new standard, as Cone suggests. Rather, it seems merely to affirm Tennessee's standard of waiver.

In *Coe,* as we explained earlier, this court held that the petitioner had procedurally defaulted his state claim that the trial court failed to give a correct malice instruction. He presented the claim for the first time in his second petition for post-conviction relief rather than his first petition, as a consequence of which the Tennessee Court of Criminal Appeals found it had been procedurally waived. *Coe,* 161 F.3d at 329-31. This court cited *House* when determining that Coe had defaulted his claim under an "objective" standard of waiver. However, the petition

checked, he found that he had killed her. He took her body down by a creek running near their home and hid it with some brush and branches.

Whether Mr. Muncey ever went back to the dance is uncertain. Constable Wallace, who was providing security at the dance, testified that he never saw Mr. Muncey return after he left around 10:30 p.m. Mr. Muncey claimed during the hearing that he never left the dance until it broke up some two or more hours later.

Petitioner's brief at 33-34. Petitioner also points out that Dennis Wallace[3] did not think that Mr. Muncey seemed upset when he reported his wife's disappearance or when the body was recovered. Also, Mr. Muncey asked a neighbor, Artie Lawson, the next morning to tell people that he was at the dance. Since she had not attended it herself, she declined. Her daughter, Mary Atkins, however, testified that she not only saw Little Hube at the dance, but that she saw him hit his wife.

The district court discounted the testimony of Letner and Parker: "The court is not impressed with the allegations of individuals who wait over ten years to come forward with their evidence." Memorandum Opinion, February 16, 2000 at 45. Instead, the court credited the testimony of Lora Muncey Tharp, the daughter who testified at both the trial and evidentiary hearing:

While in bed, she heard a deep voice saying her dad had been involved in a wreck next to the creek. Sometime later she and her brother got up and went looking for their mother. They went to the neighbors and looked up and down the driveway. She did not see anything out of the ordinary in the house; nothing was out of place and there was no sign of a struggle.

---

[3] Dennis Wallace was the Chief of Police of Luttrell, the nearest town.

sitting around drinking when Mr. Muncey "started crying and going on and rambling off." According to Parker, he was "[t]alking about what happened to his wife and how it happened and he didn't mean to do it, but I don't know exactly what all was said." She went on, "[H]e said they had been into an argument and he slapped her and she fell and hit her head and it killed her and he didn't mean for it to happen." He was drunk when he made this confession. After hearing it, Parker claimed, "I freaked out and ran him off." The next day her mother took her to the courthouse to tell someone about it. However, "I never did really get to talk to anybody." When the district court asked her about the motivation behind her testimony, she replied, "An innocent man is in jail."

On cross-examination, Parker testified that she had tried to come forward but no one seemed interested. She had had seven or eight beers on the night of the confession.

Parker's sister, Penny Letner, also heard the confession from Little Hube. Once again, she recalled that he was "pretty well blistered." According to Letner,

> He said he didn't mean to do it. That she was "bitching him out" because he didn't take her fishing that night, that he went to the dance instead. He said when he come home that she was still on him pretty heavily "bitching him out" again and that he smacked her and that she fell and hit her head. He said he didn't mean to do it, but I had to get rid of her, because I didn't want to be charged with murder.

Letner had not been drinking. She was frightened by the talk and left the party. As a young mother of 19, she was too scared to report the confession.

Based upon the statements of Letner and Parker, petitioner posits the following scenario:

> When Mr. Muncey got home, he and his wife resumed their fight. He hit her at least once and she fell. When he

upon which the court relied in finding the default was filed before *House* was decided. Thus, concerning defaults that occurred before *House* was decided, the Tennessee courts have strictly and regularly applied the traditional standard of waiver, whether the waiver is made by counsel or the petitioner personally.

> . . . .

> Last, we are not persuaded that Cone is correct in his claim that Tennessee law was in a state of confusion on whether an "objective" or "subjective" standard of waiver is appropriate. It is not clear from the Tennessee cases that procedural default may not be charged to a petitioner who has not himself "knowingly and understandingly" waived timely assertion of a federal constitutional claim when his attorney has done so. We are satisfied that Tennessee follows the traditional rule that a petitioner is chargeable with his attorney's failure to timely assert a claim and with the consequences of failing to do so.

*Id.* at 974. We find this reasoning dispositive of the issue before us and accordingly conclude that the district court was correct when it determined that petitioner's ineffective assistance of counsel claims had been procedurally defaulted.

### III.

We turn next to petitioner's claim of actual innocence. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Court held that a petitioner must show either cause and prejudice or a miscarriage of justice in order to obtain habeas review of an otherwise procedurally defaulted claim. With respect to a miscarriage of justice, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 531 U.S. at 832. This exception is rare and should be applied only in the extraordinary case:

> Claims of actual innocence pose less of a threat to scarce judicial resources and to principles of finality and

comity than do claims that focus solely on the erroneous imposition of the death penalty. Though challenges to the propriety of imposing a sentence of death are routinely asserted in capital cases, experience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. See *supra,* at 864. To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful. Even under the pre-*Sawyer* regime, "in virtually every case, the allegation of actual innocence has been summarily rejected." The threat to judicial resources, finality, and comity posed by claims of actual innocence is thus significantly less than that posed by claims relating only to sentencing.

Of greater importance, the individual interest in avoiding injustice is most compelling in the context of actual innocence. The quintessential miscarriage of justice is the execution of a person who is entirely innocent.

513 U.S. at 324-25 (footnotes omitted). Thus, "[t]o establish the requisite probability [that petitioner is actually innocent], the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 327.

Because the district court conducted an evidentiary hearing on the issue, there is testimony about events beyond what was presented during the original trial. Petitioner contends that this new evidence is sufficient to establish his actual innocence. We will summarize it before explaining why, in our view, petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him.

Without question, one or more tubes of Mrs. Muncey's blood spilled at some time. It is likely the spillage occurred prior to the receipt of the evidence by [the] laboratory hired by Mr. House's trial attorney. Based upon the evidence introduced during the evidentiary hearing, however, the court concludes that the spillage occurred after the FBI crime laboratory received and tested the evidence.

. . . [T]he enzyme deterioration, as well as Mr. Muncey's alleged confession and the blood spillage, does not negate the fact that Agent Scott saw what appeared to be bloodstains on Mr. House's blue jeans when the jeans were removed from the laundry hamper at Ms. Turner's trailer and that the blood was in fact from Mrs. Muncey.

Memorandum Opinion, February 16, 2000 at 45-46.

Petitioner not only presented evidence to the district court that undermined the case against him, he also offered an alternative theory of the crime: that Mr. Muncey killed his wife.

At the evidentiary hearing, petitioner produced witnesses who testified about Mr. Muncey's alcoholism and also his physical abuse of his wife. One acquaintance, Kathy Parker testified, "[Mrs. Muncey] was constantly with black eyes and busted mouth." A friend, Hazel Miller, testified that Mr. Muncey told her that was going to get rid of his wife a few months before her death. In the district court, Mr. Muncey acknowledged that he "smacked" his wife at least once.

As for the day of the murder, Mr. Muncey was supposed to help dig a grave. He went over to his father's place, helped to work on some cars, then dug the grave. However, rather than go home, he went to the weekly dance at the C & C Recreation Center where he testified that he stayed until about midnight. He then arrived home to find his wife missing.

Kathy Parker told the district court that Mr. Muncey visited her on a Friday night in 1985 after the murder. Friends were

Dr. Blake testified that there was no total chain of custody. Also, according to Dr. Blake, Dr. Carabia [the coroner] failed to refrigerate and preserve the blood in the tubes, failed to seal the tubes of blood, which could result in spillage, and failed to package the items individually.

Dr. Blake's testimony was based upon his review of photographs of the physical evidence, and was relevant to Dr. Blake's opinion that the blood on petitioner's blue jeans resulted from spillage of Mrs. Muncey's blood in the laboratory tubes. . .

. . . .

Dr. Blake testified that if fresh blood had spilled on the blue jeans while Mrs. Muncey was alive, and then dried, the enzymes on the jeans would not have deteriorated to the same extent as the enzymes in the blood taken from Mrs. Muncey. From this, Dr. Blake concluded the blood was not spilled on the jeans while Mrs. Muncey was alive but rather came from the spillage of the test tubes.

Dr. Blake also testified with respect to the age of Mr. House's bruises, based upon photographs taken from the state court record. Dr. Blake estimated some bruises at one to two days old; others at five to six days old. Also, in Dr. Blake's opinion, the bruising on Mr. House's right ring finger was an injury from being mashed; it was not consistent with striking someone.

Memorandum Opinion, February 16, 2000 at 37-38.

The district court also recapped the testimony of the blood spatter expert Ms. Sutton, who concluded that "the blood stains could not have resulted from spillage because the blood and mud would have had to have spilled at the same time." Memorandum Opinion, February 16, 2000 at 42.

With respect to the blood, the court determined,

---

Petitioner testified for the first time at the evidentiary hearing. He offered this version of the night of the murder: "I went for a walk. I got jumped, ran around, came back." He went on to explain that the terrain was hilly and it was dark:

I had only been walking about maybe 20 minutes at the most it seems like. A truck pulled up behind me with, I remember it as being like 4-wheel drive. It sat up high, you know. Headlights were on. It had lights across the roof of the cab and they were on. I couldn't see anything other than that about the truck. . . . I turned around and I kept walking. I believe there were at least two guys in the truck. I know the driver got out on his side, one guy got out on the passenger side. I couldn't really discern it, but I think there was one other guy in the cab. The driver came up. I can remember he said something, but I don't even know if I heard him correctly at the time. He grabbed me by the arm. He started to jerk me around. I turned around turned and threw back with my left-hand. I hit him. He let go. I started running. I ran kind of diagonally across the road into some trees, bushes, whatever it was. I heard a shot, at least one. There might have been two. I am not sure. I ran around through those woods for a while. I don't know how long. When I came back out – I believe at one point I ran to the right, once I got into the woods, and started heading back. . . . I went back across the road up to Donna's house. When I got, I stepped on something, a sharp rock or something. I knew I stepped on it. When I looked down I only had one shoe. I lost one of them while I was running. I took the other one off and threw it across the road.

. . . .

I didn't even notice my shirt was gone until I got up to the trailer. . . .

As the factual summary of the Tennessee Supreme Court attests, this version of events does not differ markedly from the one presented by Donna Turner during trial. When asked why he initially lied to investigators by telling them that he

had not left the trailer at all, petitioner responded, "I was on parole. I didn't want to draw attention to myself."

In short, petitioner's testimony merely restates a scenario presented to the jury that convicted him. Moreover, the district court, which had the opportunity to assess petitioner's demeanor, found his testimony to be less than credible.

During the evidentiary hearing, petitioner devoted considerable time to the trial testimony of Billy Ray Hensley, the individual who saw petitioner near the spot where the body was discovered. Specifically, petitioner introduced maps and photographs in order to show that Hensley could not have seen what he purported to see.

At trial, Hensley testified that his wife received a call at about 2 p.m. on July 14 that Mrs. Muncey was missing. He drove to the Muncey trailer and talked to some of the family members. He then "went to check on my tobacco." After visiting his fields, he ended up on Bear Hollow Road, which is near where the Muncey's live.

He then had an encounter with petitioner, which he described in these terms:

[J]ust before I rounded the curve on Ridgecrest, whatever the name of that road is, I saw Mr. House come out from under a bank, wiping his hands on a black rag. And I went on down to Little Hube's[2] driveway. I pulled up in the driveway where I could see up toward Little Hube's house and I seen Little Hube's car wasn't there, and I backed out in the road, and come back towards to the Dump Road, that is what I call it. And that is when Mr. House flagged me down . . . .

---

[2]"Little Hube" is the nickname of the victim's husband, Hubert Muncey.

obtained a consent to search from Ms. Turner. He went to Ms. Turner's home and seized a pair of blue jeans from the clothes hamper in the bathroom. The jeans had "reddish brown" stains that he suspected was [sic] blood on the upper part of the jeans and near the cuff; there was also some light colored mud that was not completely dry.

Mr. Scott did not thoroughly examine the jeans at that time but rather folded them and put them in a paper bag. Mr. Scott did not recall ever seeing the jeans in a plastic bag.

Memorandum Opinion, February 16, 2000 at 23.

The court then summarized the testimony of petitioner's expert witnesses. Larry Johnson testified as an expert in crime scene investigation and opined that "the packaging of materials in the case did not meet professional standards" because items were not wrapped separately. DNA expert Lisa Calandro eliminated petitioner as the donor of the semen found on Mrs. Muncey's underwear and nightgown.

Howard Bragdon, manager of laboratory operations for DCI Laboratory in Nashville testified for petitioner as well. This laboratory had performed the blood analysis for petitioner at trial. Bragdon noted that he took possession of the blue jeans, the victim's clothes and fingernail scrapings, as well as blood from both the victim and petitioner, on October 29, 1985. The next day, after transporting them to Nashville, he took pictures that showed dried blood around the upper left corner of the box in which the items had been contained. According to the district court, "Mr. Bragdon admitted that it was his custom to inspect the condition of serological evidence when he took possession and that there was no notation on the receipt of spillage. Mr. Bragdon also admitted that he had no way of knowing the condition of the blood samples at the time of the FBI's serological testing." Memorandum Opinion, February 16, 2000 at 35.

The court characterized Dr. Blake's testimony as follows:

degree of enzymatic degradation, that the blood on the blue jeans came from known samples, such as the blood contained in the vials, and not from Mrs. Muncey's body. When confronted with this conclusion, Agent Bigbee was doubtful, noting that much depended upon handling and individual circumstances.

An expert on blood splatter analysis, Paulette Sutton, also testified at the evidentiary hearing. She noted that some of the blood stains on the jeans were mixed with mud. Yet the photographs of the crime scene showed no mud present. Furthermore, National Weather Service records show that it had not rained for three days prior to the murder. Finally, there was no mud on the victim's nightgown.

Finally, petitioner notes that no blood was found on the tennis shoes he was wearing on the night of the murder. Charles Burks, petitioner's trial attorney, also testified at the evidentiary hearing. The district court summarized his testimony on the issue of the tennis shoes as follows:

> During the evidentiary hearing, Mr. Burks reviewed a report from the Forensic Services Department of the TBI, which referred to Mr. House's tennis shoes and indicated the absence of blood on the tennis shoes. Mr. Burks did not recall having seen that report before. That would have been relevant to Mr. Burks because, although there was blood on Mr. House's jeans near the cuff, there was no blood on the shoes he was wearing at the time of the offense. The shoes were found in the general area of Ms. Turner's trailer long after the murder.

Memorandum Opinion, February 16, 2000 at 25.

The court recounted the discovery of the blue jeans in these terms:

> TBI Agent Charles Scott testified that he became involved in the investigation of Mrs. Muncey's murder, at the request of another agent, on the second day of the investigation. He took a statement from Mr. House and

The two men had a short conversation about the fact that Mrs. Muncey was missing. Petitioner was driving his girlfriend's white Plymouth.

After leaving, Hensley became suspicious and, along with his friend Jackie Adkins, returned to the spot where he thought petitioner had emerged: "I said – right along here is where I saw the boy [petitioner], and I got out and was looking off the bank, and he [Adkins] got out and walked around the car and he said – oh, my God."

On cross-examination, Hensley conceded that he could not have seen petitioner actually "down in the embankment." He would have first seen him at the top of the bank. Defense counsel also tried to bring out some inconsistencies in Hensley's statements concerning precisely when and where he first saw petitioner. On re-direct, the prosecution attempted to have Hensley clarify:

Q.  Let me ask you if this is a true statement – "I travelled about 500 feet on Ridgecrest Road when I saw a '66 or '67 white Plymouth sitting on the left-hand side of Ridgecrest Road," is that true?

A:  That's true.

Q.  Is that where you saw the car?

A:  Yes, sir.

Q:  Is this true? "I saw a man later identified to me as Paul G. House enter the roadway from the right-hand side of the road"?

A:  He was walking toward the road, yes.

Q:  All right. "And he was coming up over the bank and he had a black rag in his hand and he was wiping his hands," is that true?

A:   That's true.

. . . .

Q:   The estimation [of the distance on the road] that you have given, that you were pressed for, is that an accurate measurement or is that an estimate on your part?

A:   That is just an estimate.

The exhibits introduced by petitioner during the evidentiary hearing were designed to show that Hensley could not have seen petitioner coming up the embankment. However, even if we accept petitioner's contention that Hensley could not have seen him until he emerged onto the road, it is undisputed that petitioner was seen in the general vicinity of the body carrying a black rag. Moreover, trial counsel effectively cross-examined Hensley regarding his inconsistent statements about when and where he saw petitioner. Thus, in our view, petitioner's attack on Henley's testimony advances his cause little, if at all.

In addition to presenting his own version of events while attempting to cast doubt on the accuracy of Hensley's testimony, petitioner takes aim at the physical evidence that linked him to the crime.

Dr. Alex Carabia performed the autopsy. He testified at trial that death was caused by a blow to the left side of her head. The victim died about an hour and a half after she was hit.

At trial, photographs of the bruises on petitioner's body were entered into evidence and three witnesses testified about his physical condition. Prior to his arrest, petitioner provided various accounts of their origin: the mysterious fight on the night of the murder; tearing down a shed a few days earlier. During closing argument, the prosecution emphasized these inconsistent statements.

At trial, FBI Agent Paul Bigbee testified that the blood samples taken from the victim were degraded. Nonetheless, the blood found on the jeans was consistent with that of the victim and not with that of petitioner.

At the evidentiary hearing, petitioner mounted a concerted challenge to this evidence.

Four vials of blood were taken from the victim during the autopsy. These were placed in a styrofoam container, which was sent from the Tennessee Bureau of Investigation (TBI) to the FBI. The petitioner referred to two demonstrative exhibits in the district court: photographs of the styrofoam container viewed from above and from the side. It was sealed by the TBI in both directions for shipping. The photograph of the side view shows that one of the seals was broken and then resealed by a second layer of tape. FBI Agent Bigbee placed his lab number on the second layer. The first layer of tape is incomplete; it only covers the lid of the container. Agent Bigbee conceded that it was possible that the first seal had been cut before the second seal had been placed over it. To support the theory that the container was opened between the time it left the TBI and arrived at the FBI, petitioner points to the fact that the label on the container indicated that it held both blood and vaginal secretions. Yet, Agent Bigbee received the secretions in a manilla envelope.

As mentioned above, four vials of blood were sent to the FBI. According to Agent Bigbee, he would have used one fourth of a vial in testing. Petitioner's trial serology expert, Howard Bragdon, took a photograph when he received the styrofoam container from the FBI. In petitioner's view, the photograph shows one of the tubes was only one-half full and another nearly empty. Furthermore, Agent Bigbee's testimony to the contrary, it appears that some blood had spilled.

In the district court, Dr. Cleland Blake, Assistant Chief Medical Examiner for the State, examined the results of the FBI tests of the blood found on the blue jeans and also the blood taken from Mrs. Muncey. He theorized, based upon the